## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RUSTIK HAWS, LLC, a Florida Limited
Liability Company,

                                         Case No.: 8:21-cv-00565-MSS-AEP

            Plaintiff,

v.

IDENTIQA SOLUTIONS CO.,
IDENTIQA GROUP OF COMPANIES, INC.,
ARCUS INNOVATIONS, INC., LORAINE
SUMBING, LEOVIE JOY CANDIA,
LIME PRESS, LLC, and EARL KENT
ESPINOSA,

            Defendants.

_____

### ORDER

**THIS CAUSE** comes before the Court for consideration of Plaintiff Rustik Haws, LLC Motions for Default Judgment against all Defendants. (Dkts. 108, 114) Upon consideration of all relevant filings and case law, and being otherwise fully advised, the Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motions for Default Judgment.

### I.      BACKGROUND

#### a. Factual Background

Plaintiff Rustik Haws, LLC brings an action for damages and injunctive relief against Defendants IDENTIQA SOLUTIONS CO. ("IDENTIQA SOLUTIONS"), IDENTIQA GROUP OF COMPANIES, INC. ("IDENTIQA GROUP"), ARCUS

INNOVATIONS, INC., LORAINE SUMBING, LEOVIE JOY CANDIA (all the aforementioned together referred to hereinafter as the "IDENTIQA Parties") LIME PRESS, LLC, ("LP") and EARL KENT ESPINOSA ("ESPINOSA").

Plaintiff contends that, since its foundation in 2019, it has partnered with authors to turn their manuscripts into finished books and e-books, which Plaintiff has marketed and sold nationwide and internationally. (Dkt. 63 at ¶¶ 24-26) In operating and building its business, Plaintiff has created proprietary trade and secret information such as client pricing guides, client lists, internal marketing and publication processes, referral sources, fulfillment tracker lists, and prospective information lists. (Id. at ¶ 28) Plaintiff states that it has devoted significant monetary resources toward nationwide advertising of its publishing services and, further, that its publishing and digital marketing services have assisted rising authors in gaining unique exposure and recognition in the industry. (Id. at ¶¶ 29-30)

On September 28, 2019, Plaintiff entered into an Outsourcing Service Agreement ("the Agreement") with Defendant IDENTIQA SOLUTIONS, a Philippine corporation, for a variety of non-exhaustive services, including print job fulfillment services, marketing, copyediting, data entry, client information intake, and project planning services. (Id. at ¶ 31)

The Agreement contained a confidentiality provision, which provided that IDENTIQA SOLUTIONS would not disclose, divulge, reveal, report, or use, for any purpose, any confidential information it obtained by way of the Agreement with Plaintiff. (Id. at ¶ 35; (Dkt. 63-2 at 4)) Confidential information "refers to any data or

information relating to the business of the Client which would reasonably be considered to be proprietary to the Client including, but not limited to, accounting records, business processes, and client records and that is not generally known in the industry of the Client and where the release of that Confidential Information could reasonably be expected to cause harm to the Client." (Dkt. 63 at ¶ 35; Dkt. 63-2 at 3-4)

The Agreement also provided that Plaintiff owned all intellectual property developed or produced under the Agreement, that IDENTIQA SOLUTIONS could not use the intellectual property without Plaintiff's written consent, and that IDENTIQA SOLUTIONS would be responsible for any and all damages resulting from the unauthorized use of the intellectual property. (Dkt. 63 at ¶ 36; Dkt. 63-2 at 4) In the event of a breach, the Agreement stated that the non-defaulting party may require the defaulting party to indemnify the non-defaulting party against all reasonable damages. (Dkt. 63 at ¶ 37; (Dkt. 63-2 at 4)) Plaintiff claims that all officers and employees of IDENTIQA SOLUTIONS, including Defendants LORAINE SUMBING and LEOVIE JOY CANDIA, were bound by the Agreement. (Dkt. 63 at ¶ 38)

Plaintiff states that it provided IDENTIQA SOLUTIONS access to its confidential, proprietary information, including, inter alia, its bank account information, social security information, customer lists, and login information for Plaintiff's websites, email accounts, and vendor accounts. (Id. at ¶ 39)

In August 2020, the IDENTIQA Parties made Plaintiff's confidential information available to Defendant LIME PRESS, LLC ("LP"), a Virginia company controlled by Defendant EARL KENT ESPINOSA ("ESPINOSA"). (Id. at ¶¶ 43, 45, 67) LP is Plaintiff's direct competitor in the publishing and digital marketing markets. (Id. at ¶ 69) Specifically, IDENTIQA had access to Plaintiff's vendors, contractors, and social media accounts, including Google G-Suite and Gmail, Amazon Web Service Account, Bit Bucket, Vonage, and YouTube. (Id. at ¶ 44) IDENTIQA provided LP with Plaintiff's current and prospective client lists and began contacting Plaintiff's clients on behalf of LP. (Id. at. ¶¶ 46-47) Plaintiff contends that IDENTIQA informed Plaintiff's customers that Plaintiff was no longer in business and that Plaintiff had begun working for LP. (Id. at ¶ 48)

In September 2020, Defendants SUMBING and CANDIA suddenly informed Plaintiff that IDENTIQA SOLUTIONS would no longer continue performance under the Agreement. (Id. at ¶ 54) On or around October 1, 2020, an operator of IDENTIQA SOLUTIONS and IDENTIQA GROUP provided Plaintiff with non-working credentials needed for it to "operate even the most vital of business functions, such as keeping its website online." (Id. at ¶ 62) Plaintiff claims that it has attempted to communicate with IDENTIQA SOLUTIONS since October 1, 2020, but has received no replies from Defendant. (Id.)

Plaintiff further asserts that when it began to express its concerns about IDENTIQA SOLUTIONS' performance under the Agreement, "SUMBING and CANDIA transferred assets from IDENTIQA SOLUTIONS to IDENTIQA GROUP

without IDENTIQA SOLUTIONS receiving a reasonably equivalent value in exchange for such transfers." (Id. at ¶ 63) Plaintiff contends that "IDENTIQA SOLUTIONS became insolvent after such transfers." (Id. at ¶ 64) Plaintiff claims that Defendants' actions have forced Plaintiff to issue returns to customers due to Defendants' breach. (Id. at ¶ 81)

In August 2020 and September 2020, LP announced and advertised its publishing of different books by different authors, all of whom had a business relationship or were under contract with Plaintiff at the time. (Id. at ¶¶ 51-53; Dkts. 63-4, 63-5, 63-6) Plaintiff states that its existing customers have informed Plaintiff that LP represented to them that Plaintiff is related to LP, that Plaintiff had moved to Virginia (where LP is located) due to the COVID-19 pandemic, and that Plaintiff's customers should purchase services from LP instead of Plaintiff. (Id. at ¶¶ 71-72) LP has copied, imitated, and reproduced a website virtually identical to that of Plaintiff, which has been displayed to the public. (Id. at ¶ 74) LP has also provided an identical standard service agreement of Plaintiff's to Plaintiff's previous, current, and prospective customers. (Id. at ¶ 75); (Dkt. 63-7)

Plaintiff claims that LP has failed to provide publishing and marketing services after collecting sums of money from diverted clients. (Id. at ¶ 76) According to Plaintiff, Defendants' actions have caused several of Plaintiff's customers to terminate their relationship with Plaintiff in order to form a new relationship with LP. (Id. at ¶ 78) Their actions have also caused several of Plaintiff's customers to post negative

reviews, threaten lawsuits, and file a complaint with the State of North Carolina Consumer Protection Division. (Id. at ¶ 80); (Dkt. 63-8)

Plaintiff states that it has always been the "sole, worldwide copyright owner of certain content in textual form including, without limitation, its business forms, contracts and website content." (Id. at ¶ 40) The content is the subject of United States Copyright Registration Number TXu002257152 bearing an effective date of March 18, 2021. (Id.); (see Dkt. 63-3)

Upon the commencement of this litigation, Plaintiff states that IDENTIQA GROUP and LP "deleted and/or disabled their public Facebook pages." (Dkt. 63 at ¶ 82) IDENTIQA GROUP has also deleted its LinkedIn page. (Id. at ¶ 84) Plaintiff claims that Defendants have "purposefully destroyed files and deleted public page accounts with the intent of hindering [Plaintiff's] ability to prove the suit." (Id. at ¶ 85) In sum, Plaintiff argues that Defendants' actions have caused grave harm to Plaintiff's goodwill and business reputation, including its ability to acquire new customers and retain existing customers. (Id. at ¶¶ 86-87)

### b. Procedural History

Plaintiff initiated this action on March 11, 2021. (Dkt. 1) On November 14, 2022, Plaintiff filed its Second Amended Complaint after the Court granted Plaintiff leave to do so. (Dkts. 57, 63) In the Second Amended Complaint, Plaintiff raises eleven counts against Defendants for: (i) misappropriation and unauthorized disclosure of trade secrets against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP under the federal Defend Trade Secrets Act ("DTSA"); (ii) misappropriation of trade secrets

6

under Florida's Uniform Trade Secrets Act against all Defendants ("FUTSA"); (iii) false designation of origin and false description under the Lanham Act against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP ("Lanham Act"); (iv) violation of Florida's Deceptive and Unfair Trade Practices Act against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP ("FDUTPA"); (v) civil conspiracy against all Defendants; (vi) tortious interference with business relations against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP; (vii) breach of contract against IDENTIQA SOLUTIONS; (viii) fraudulent transfer under Florida law against the IDENTIQA Parties; (ix) copyright infringement against LP and Espinosa; (x) disregard of corporate veil against the IDENTIQA Parties; and (xi) unjust enrichment against the IDENTIQA Parties. (Dkt. 63 at 16-31)

On November 15, 2022, summonses were issued for the foreign corporate Defendants ARCUS INNOVATIONS, INC., IDENTIQA GROUP OF COMPANIES, INC., and IDENTIQA SOLUTIONS CO, which are all Philippine corporations. (Dkt. 64) On November 15, 2022, summonses were also issued for the individually named Defendants, LORAINE SUMBING and LEVOIE JOY CANDIA, who also reside in the Philippines. (Dkts. 64, 65)

While LP previously appeared in this action, (Dkt. 33), counsel for LP subsequently withdrew as attorney for both LP and ESPINOSA on November 23, 2022. (Dkt. 67) Since that date, LP has not appeared in this action via counsel, and ESPINOSA has appeared *pro se*. The Court held four status conferences on July 25, 2023 (Dkt. 73), September 15, 2023 (Dkt. 80), September 28, 2023 (Dkt. 84), and

October 18, 2023 (Dkt. 88), to ascertain whether service had been successful on the foreign entities and individuals (it was not), whether LP intended to obtain counsel, and, finally, whether Plaintiff intended to move for default, and then default judgment, against LP.

On March 6, 2024, the Court issued an order granting Plaintiff's Motion for Entry of Clerk's Default Against LP after it failed to comply with a previous Court order requiring it to obtain counsel within an allotted time. (Dkts. 95, 96) On April 16, 2024, the Court granted Plaintiff leave to conduct alternative service of process upon the Philippines-based Defendants via email or alternative means. (Dkt. 102) On June 5, 2024, the Court granted Plaintiff's Motion for Entry of Clerk's Defaults against the Philippines-based Defendants after it found that they failed to serve an answer or responsive pleading to the Second Amended Complaint within the time period provided for under the Federal Rules of Civil Procedure or move for an extension of time to do so. (Dkts. 106, 107) On July 10, 2024, Plaintiff moved for default judgment against the Philippines-based Defendants. (Dkt. 108) No opposition has been filed, and the time to do so has expired.

On December 2, 2024, the Court granted Plaintiff's Motion for Entry of Clerk Default Against ESPINOSA after he also failed to timely serve an answer or responsive pleading to the Second Amended Complaint, or move for an extension of time to do so. (Dkts. 112, 113) On January 6, 2025, Plaintiff moved for default judgment against ESPINOSA. (Dkt. 114) No opposition has been filed, and the time to do so has expired. Both motions are now ripe for review.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 55(b)(2), a court may enter a default judgment against a party who has failed to plead in response to a complaint. Solaroll Shade & Shutter Corp. v. Bio-Energy Sys., 803 F.2d 1130, 1134 (11th Cir. 1986) ("Rule 55 applies to parties against whom affirmative relief is sought who fail to 'plead or otherwise defend.'"). All well-pleaded allegations of fact are deemed admitted upon entry of default. See Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). However, a defendant's default alone does not require the court to enter a default judgment. DIRECTV, Inc. v. Trawick, 359 F. Supp. 2d 1204, 1206 (M.D. Ala. 2005). To enter a default judgment, there must be a sufficient basis in the pleadings to support the entry of judgment. Id. "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short, . . . a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover." Nishimatsu, 515 F.2d at 1206.

If the facts in the complaint are sufficient to establish liability, then the court must conduct an inquiry to ascertain the amount of damages. See Adolph Coors Co. v. Movement Against Racism & the Klan, 777 F.2d 1538, 1543-44 (11th Cir. 1985). Damages may be awarded only if the record adequately reflects the basis for the award via a hearing or a demonstration of detailed affidavits establishing the necessary facts. See id. at 1544. A hearing is not mandatory on the issue of damages if sufficient evidence is submitted to support the claimed damages. Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Manuf. Co., 142 F. Supp. 3d 1245,

9

1255 (M.D. Fla. 2015); <u>Adolph Coors Co.</u>, 777 F.2d at 1543 (explaining that "a judgment of default awarding cash damages could not properly be entered without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation.").

## III.    DISCUSSION

Under Federal Rule of Civil Procedure 55(b)(2), Plaintiff requests an entry of final judgment of default against Defendants for claims asserted under Count I (the DTSA claim), Count II (the FUTSA claim), Count III (the Lanham Act claim), Count IV (the FDUTPA claim), Count V (the Civil Conspiracy claim), Count VI (the tortious interference with business regulations claim), Count VII (the breach of contract claim), Count VIII (the Fraudulent Transfer claim), Count IX (the copyright infringement claim), Count X (the disregard of the corporate veil claim), and Count XI (the Unjust Enrichment claim). Upon review, the Court **GRANTS IN PART and DENIES IN PART** the Motions for Default Judgment.

### A. Liability

#### i. Count I - DTSA Claim Against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP

In Count I, Plaintiff seeks damages against Defendants IDENTIQA SOLUTIONS, IDENTIQA GROUP, and LP for violating the Defend Trade Secrets Act, 18 U.S.C. § 1836. (Dkt. 63 at ¶¶ 91-100) In relevant part, the DTSA provides:

> As used in this chapter . . . . (3) "[T]rade secret" means **all forms** and types of **financial, business** . . . including

10

patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

**(A)** the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C.S. § 1839(3) (emphasis added). Thus, to plausibly allege a claim under the DTSA, the plaintiff must adequately plead three elements: "(1) the plaintiff owns a valid trade secret; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; and (3) the defendant misappropriated that trade secret." See It Works Mktg. v. Melaleuca, Inc., No. 8:20-cv-1743-T-KKM-TGW, 2021 U.S. Dist. LEXIS 80298 at *20 (M.D. Fla. Apr. 27, 2021).

Plaintiff's well-pleaded allegations support its claim for relief under the DTSA. First, Plaintiff alleges that its "customer lists, customer information, service timelines, pricing guidelines [,] client leads sheets, and fulfillment tracking documentation constitute trade secrets within the meaning of 18 U.S.C. § 1839(3)". (Dkt. 63 at ¶ 92) Plaintiff alleges that such information is "confidential and proprietary." (Id. at ¶ 94) As such, Plaintiff has adequately alleged that it owns a valid trade secret. See It Works

Mktg., 2021 U.S. Dist. LEXIS 80298 at *21 (denying motion to dismiss where plaintiff
alleged its agreement expressly stated that the reports at issue "constitute[d] trade
secrets" and where plaintiff also alleged that its "eSuite website contain[ed] proprietary
and confidential information").

Second, Plaintiff alleges that its trade secrets relate to a product or service used
in, or intended for use in, interstate commerce. See id. (finding interstate commerce
element met where plaintiff alleged it "ha[d] thousands of distributors across the
United States and is a competitor of It Works"). Here, Plaintiff alleges that "[s]ince its
foundation in 2019, [Plaintiff] has promoted and marketed hundreds of authors' self-
published books and third-party-published books and has published hundreds of books
and sold thousands of book and e-book products nationwide and internationally."
(Dkt. 63 at ¶ 25) Thus, Plaintiff has adequately alleged the second element for a claim
under the DTSA. See It Works Mktg., 2021 U.S. Dist. LEXIS 80298 at *21.

Third, Plaintiff alleges that Defendants IDENTIQA SOLUTIONS,
SUMBING, and CANDIA misappropriated RH's trade secrets when they "disclosed
the trade secrets described above without express or implied consent from [Plaintiff],
thus breaching its confidentiality obligations under the Agreement." (Dkt. 63 at ¶ 96)
Plaintiff claims that "Defendant LP acquired the trade secrets described above without
express or implied consent from [Plaintiff] and have used improper means to acquire
knowledge of such trade secrets in concert with IDENTIQA SOLUTIONS,
SUMBING [,] and CANDIA." (Id. at ¶ 97)

For example, Plaintiff asserts "[t]he IDENTIQA Parties made [Plaintiff's]
Confidential information available to LP via Google Drive" and "began contacting
Plaintiff's existing clients and potential clients on behalf of LP." (Id. at ¶¶ 46-47)
Plaintiff further alleges that LP "was aware of the contractual relationship between [it]
and IDENTIQA SOLUTIONS" and "was aware of the contractual relationship
between [Plaintiff] and its clients." (Id. at ¶¶ 60-61) These allegations are sufficient to
establish the Defendants misappropriated Plaintiff's trade secrets. See It Works Mktg.,
2021 U.S. Dist. LEXIS 80298 at *21 (finding third element adequately pled where
plaintiff alleged defendant misappropriated its trade secret when it recruited plaintiff's
distributors and, through those distributors, acquired and used plaintiff's activity
reports to determine which other distributors to recruit).

In sum, based on Plaintiff's allegations, which are deemed admitted by virtue
of Defendants' default, the Court finds that Plaintiff has sufficiently established its
entitlement to recover against IDENTIQA SOLUTIONS, IDENTIQA GROUP, and
LP for violating the DTSA.

### ii.  Count II – Florida's Uniform Trade Secrets Act Against All Defendants

In Count II, Plaintiff seeks damages against all Defendants for violating
Florida's Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 et seq. (Dkt. 63 at ¶¶ 101-
05) The FUTSA and the DTSA generally share the same elements. See It Works Mktg.
v. Melaleuca, Inc., No. 8:20-cv-1743-T-KKM-TGW, at *18. "To satisfy the pleading
requirements under the Florida Uniform Trade Secrets Act, the plaintiff need only

allege facts that plausibly show that a trade secret was involved and that give notice to the defendant about the alleged trade secrets at issue." <u>DynCorp Int'l v. AAR Airlift Grp.</u>, 664 F. App'x 844, 848 (11th Cir. 2016).[1]

Plaintiff alleges a plausible claim for relief under FUTSA because it provides facts showing that its customer lists, customer information, service timelines, pricing guidelines, client lead sheets, and fulfillment tracking documentation are trade secrets. (Dkt. 63 at ¶ 92, 102) Plaintiff alleges that information, such as its client lists, was confidential and proprietary and subject to confidentiality agreements and/or clauses in other agreements restricting the use and disclosure of such information. (<u>Id.</u> at ¶¶ 94, 104) And "[Plaintiff's] complaint gives the [Defendants] sufficient notice about the alleged trade secrets at issue." <u>See</u> <u>It Works Mktg.</u>, 2021 U.S. Dist. LEXIS 80298 at *22. Accordingly, the Court finds that Plaintiff is entitled to a default judgment against all Defendants for misappropriating its trade secrets under FUTSA.

### iii. Count III – Federal False Designation of Origin and False Description Under the Lanham Act Against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP

"False designation of origin" is a theory of federal trademark infringement that arises under Section 43(a) of the Lanham Act. <u>Tana v. Dantanna's</u>, 611 F.3d 767, 770 (11th Cir. 2010). In this regard, Section 43(a) prohibits the use of a mark or name that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

---

[1] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority.  <u>See</u> 11th Cir. R. 36-2."  <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000).

connection, or association of such person with another person, or as to the origin,
sponsorship, or approval of his or her goods, services or commercial activities." 15
U.S.C. § 1125(a)(1)(A). To establish a prima facie case of false designation of origin,
a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark
or name, and (2) that the defendant made use of it such that consumers were likely to
confuse the two. See Tana, 611 F.3d at 773. The Court finds that Plaintiff's allegations
fail to demonstrate a Lanham Act violation because Plaintiff has not alleged that it has
enforceable trademark rights in its name.

Plaintiff alleges that "Defendants IDENTIQA SOLUTIONS and IDENTIQA
GROUP's false, misleading and deceiving advertising mentioning an affiliation with
[Plaintiff], or that they were, in fact, the same entity or business as [Plaintiff] was, is
and will be, without permission or authority of [Plaintiff]." (Dkt. 63 at ¶ 107) Plaintiff
alleges that LP represented to Plaintiff's customers that Plaintiff and LP were affiliated
with each other. (Id. at ¶¶ 71, 75) Plaintiff alleges that Defendants convinced customers
to purchase services from LP by making such customers believe they were associated
with Plaintiff. (Id. at ¶ 72) As such, the theory behind Plaintiff's false designation of
origin claim is that Plaintiff has enforceable trademark rights in the "Rustik Haws,
LLC" name, and that Defendants unlawfully infringe on those rights by affiliating
themselves with the name "Rustik Haws, LLC" to convince customers to, among
other things, purchase services from LP related to the publishing, distribution, and
digital marketing of customers' manuscripts and other book and e-book products.

15

Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. "To satisfy the first element of § 43(a)—proof of a valid trademark—a plaintiff need not have a registered mark." Tana, 611 F.3d at 773. On the contrary, "the use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." Id. (citing Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512--13 (11th Cir. 1984) (internal quotations and citations omitted)). "However, only those marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." Id.

The Eleventh Circuit recognizes four categories of distinctiveness, "listed in ascending order of strength: (1) generic-marks that suggest the basic nature of the product or service; (2) descriptive-marks that identify the characteristic or quality of a product or service; (3) suggestive-marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful-marks that bear no relationship to the product or service, and the strongest category of trademarks." Id. at 774. Marks that fall into the last two categories are deemed "inherently distinctive" and generally are entitled to trademark protection. Id. (citation omitted). The first category of marks,

generic marks, generally are not entitled to trademark protection. Id. (citation omitted). Descriptive marks are not "inherently distinctive," but they may become sufficiently distinctive to enjoy trademark protection if they acquire "secondary meaning." Id. (citing 15 U.S.C. § 1052(f)).

A secondary meaning is acquired "when the primary significance of the term in the minds of the [consuming] public is not the product but the producer." Knights Armament Co. v. Optical Sys. Tech., Inc., 654 F.3d 1179, 1188 (11th Cir. 2011). Whether a mark has acquired a secondary meaning is dependent on "the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service." Id.

In this case, Plaintiff claims to have protectable trademark rights in the name, "Rustik Haws, LLC." Therefore, Plaintiff must allege that its name is either "inherently distinctive" or has acquired a "secondary meaning" in order to be entitled to protection. As set forth above, the Second Amended Complaint alleges that Defendants violated the Lanham Act because they provided "false, misleading and deceiving advertising mentioning an affiliation with [Plaintiff], or that they were, in fact, the same entity or business as [Plaintiff]." (Dkt. 63 at ¶ 107) These allegations, however, do not demonstrate that the Rustik Haws, LLC name is sufficiently distinctive such that it should be entitled to trademark protection. (See generally, Dkt. 63) While the Court agrees with Plaintiff that Defendants' actions were likely to cause

confusion, (see id. at ¶¶ 108-114), Plaintiff must still allege facts to establish the

distinctive nature of its name in order to be entitled to trademark protection. Plaintiff

has failed to do so. See Casey Key Resort, LLC v. CK Resorts JV, LLC, No. 8:21-CV-

1446-JLB-JSS, 2021 U.S. Dist. LEXIS 202016, 2021 WL 4893682, at *4 (M.D. Fla.

Oct. 20, 2021) (dismissing claims for trademark infringement and unfair competition

when Plaintiff failed to allege facts to establish the mark's distinctiveness).

Because Plaintiff has failed to allege it has enforceable trademark rights in the

"Rustik Haws, LLC" name, default judgment is due to be **DENIED** as to the Lanham

Act claim.

### iv. Count IV- Florida's Deceptive and Unfair Trade Practices Act Claim Against Defendants IDENTIQA SOLUTIONS, IDENTIQA GROUP, and LP

In Count IV, Plaintiff seeks damages against Defendants IDENTIQA

SOLUTIONS, IDENTIQA GROUP, and LP for violating FDUTPA, Fla. Stat. §

501.201 et seq. (Dkt. 63 at ¶¶ 118-124) FDUTPA prohibits "[u]nfair methods of

competition, unconscionable acts or practices, and unfair or deceptive acts or practices

in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To state a claim

under FDUTPA, Plaintiff must allege (1) a deceptive act or unfair practice, (2)

causation, and (3) actual damages. Carriuolo v. Gen. Motors Co., 823 F.3d 977, 983

(11th Cir. 2016) (citing City First Mortg. Corp. v. Barton, 988 So.2d 82, 86 (Fla. 4th

DCA 2008)). Regarding the first element, Plaintiff must plausibly establish that

Defendant engaged in an act or practice that was "likely to deceive a consumer acting reasonably in the same circumstances." Id. at 983-84 (citations omitted). Under Florida law, courts employ an objective test to determine whether the alleged practice was "likely to deceive a consumer acting reasonably." Id. at 984. Though non-consumers have standing to sue under the FDUPTA, they must still establish that "*there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim." Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc., 169 So. 3d 164, 169 (Fla. 4th DCA 2015) (emphasis in original).

Here, Plaintiff alleges that Defendants "engaged in . . . unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts or practices as alleged herein." (Dkt. 63 at ¶ 119) Plaintiff states Defendants' conduct "include[s], without limitation, a scheme comprised of tactics such as misrepresentations as to their identity, as to the status of [Plaintiff's] business and as to an affiliation with [Plaintiff], the misappropriation of trade secrets such as [Plaintiff's] customer lists and customer information and using such to contact [Plaintiff's] existing customer[s] to let them know that LP is associated with [Plaintiff], and in turn divert such clients from [Plaintiff] to LP." (Id. at ¶ 120) Plaintiff alleges Defendants' conduct "[is] prohibited by FDUTPA." (Id. at ¶ 121) Plaintiff claims that, due to Defendants' violations, "[Plaintiff] has suffered and will continue to suffer economic losses and irreparable injuries." (Id. at ¶ 122)

The Court finds that the foregoing well-pleaded allegations, which are deemed admitted by virtue of Defendants' default, are sufficient to establish Defendants violated FDUTPA. Plaintiff is entitled to default judgment on this claim.

**v. Count V – Civil Conspiracy Claim Against All Defendants**

Count V alleges a claim against all Defendants for civil conspiracy. Generally, an "actionable conspiracy requires an actionable underlying tort or wrong. However, an alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006) (internal citations omitted). The elements for a civil conspiracy under Florida law include: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Charles v. Florida Foreclosure Placement Ctr., LLC, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008).

Plaintiff raises the following allegations in support of its civil conspiracy claim: (1) "defendants, acting in concert with each other, agreed to take collective actions in the theft of [Plaintiff's] trade secret and proprietary [information] and application of such in LP's directly competitive business, . . . to impersonate, imitate, and pretend to be [Plaintiff] and to misrepresent an affiliation with [Plaintiff]"; (2) "[i]n furtherance of their conspiracy and scheme, Defendants . . . took overt and wrongful acts to deprive

[Plaintiff] of its customers, business, sales, income, trade secrets and other assets while using its identity, reputation, name . . . to divert clients, customers, business, sales, and revenues from [Plaintiff] to LP"; (3) "defendants, acting in concert with each other . . . have . . . purposefully deleted evidence and restricted certain previously public information from public access . . . in order to impede [Plaintiff's] continuous investigation and evidence gathering"; and (4) "through their conspiratorial acts, the Defendants have directly and proximately caused substantial injury to [Plaintiff] for which [Plaintiff] is entitled to recover damages." (Dkt. 63 at ¶¶ 125-131)

Based on the foregoing, the Court finds that Plaintiff's allegations are well-pled. It is entitled to a default judgment against all Defendants on Count V for engaging in a civil conspiracy.

### vi. Count VI – Tortious Interference With Business Relations Against IDENTIQA SOLUTIONS, IDENTIQA GROUP and LP

In Count VI, Plaintiff alleges Defendants IDENTIQA SOLUTIONS, IDENTIQA GROUP, and LP tortiously interfered with its business relationships. (Dkt. 63 at 132-40) To state a claim for tortious interference with a business relationship, Plaintiff must allege the following: "(1) the existence of a business relationship . . . (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." Ethan Allen, Inc.

v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994) (quoting Tamiami Trail
Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985)).

Here, Plaintiff alleges the existence of a business relationship between it and its
customers. (Dkt. 63 at ¶¶ 24-30) Plaintiff alleges that the IDENTIQA Parties knew of
this relationship by virtue of their contractor status and their use of Plaintiff's customer
lists to divert clients. (See id. at ¶¶41-49, 58) Plaintiff avers that they intentionally and
unjustifiably interfered with Plaintiff's relationship with its clients by contacting
Plaintiff's clients, falsely associating LP with Plaintiff, and diverting their clients to LP
while halting all performance of the Agreement and halting access to Plaintiff's own
trade secret information. (See id. at ¶¶ 71-74,136-38) And Plaintiff has alleged that it
suffered damages. (See id. at ¶¶78-81)

In light of Plaintiff's well-pleaded allegations, Plaintiff is entitled to default
judgment on its claim for tortious interference.

### vii. Count VII – Breach of Contract Claim Against IDENTIQA SOLUTIONS

Count VII asserts a claim for breach of contract against Defendants IDENTIQA
SOLUTIONS. (Dkt. 63 at ¶¶ 141-45) To state a claim for breach of contract under
Florida law, a plaintiff must allege: "(1) the existence of a valid contract, (2) a material
breach, and (3) damages resulting from the breach." See Rhodes v. Embry-Riddle
Aeronautical Univ., Inc., 513 F. Supp. 3d 1350, 1357 (M.D. Fla. 2021); Beck v. Lazard
Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999).

Here, Plaintiff alleges that it and IDENTIQA SOLUTIONS entered into a written agreement, the Outsourcing Service Agreement, which required that IDENTIQA SOLUTIONS perform its duties thereunder and not divulge, misuse, or otherwise disclose any of Plaintiff's trade secret and proprietary information. (Dkt. 63 at ¶¶ 142, 43; Dkt. 63-2) Plaintiff alleges all officers and employees of IDENTIQA SOLUTIONS, including CANDIA and SUMBING, were bound by the Agreement. (Id. at ¶ 38)

Plaintiff claims Defendants breached the terms of the Agreement. (Id. at ¶ 144) Plaintiff states that they, among other things, failed to provide services to Plaintiff and its customers, fraudulently transferred Plaintiff's trade secrets to IDENTIQA GROUP and LP, and steered Plaintiff's customers away from Plaintiff and towards LP. (Id. at ¶ 144) Plaintiff states that they halted performance of the Agreement, including publishing and marketing tasks, after receiving compensation. (Id.) Plaintiff avers that "as a direct and proximate result of [Defendants'] wrongful actions and breaches as described herein, [Plaintiff] has actual damages . . . and will continue to accrue and sustain such damages in the future on an ongoing and continuing basis." (Id. at ¶ 145)

Based on Plaintiff's allegations, which are deemed admitted by virtue of Defendants' default, the Court finds that Plaintiff has sufficiently established its entitlement to recover against IDENTIQA SOLUTIONS for breach of contract.

### viii. Count VII – Fraudulent Transfer Claim Against The IDENTIQA Parties

Count VII is brought against the IDENTIQA Parties pursuant to the constructive fraudulent transfer provision of Fla. Stat. § 726.106. (Dkt. 63 at ¶¶ 146-149; Dkt. 108 at 12-13) Chapter 726 of the Florida Statutes codifies the Florida Uniform Fraudulent Transfer Act ("FUFTA"). "Under Section 726.106(1), a transfer made by the debtor is fraudulent as to a creditor if (1) 'the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation;' and (2) "the debtor was insolvent at that time or . . . became insolvent as a result of the transfer or obligation." In re Teltronics, Inc., 904 F.3d 1303, 1310 (11th Cir. 2018).

Here, Plaintiff alleges it is a "creditor" of the IDENTIQA Parties. (Dkt. 63 at ¶ 147) Plaintiff alleges that when it "voiced its concerns about IDENTIQA SOLUTIONS's performance under the Agreement, SUMBING and CANDIA transferred assets from IDENTIQA SOLUTIONS to IDENTIQA GROUP without IDENTIQA SOLUTIONS receiving a reasonably equivalent value in exchange for such transfers." (Id. at ¶ 63) Plaintiff claims that "[w]ith knowledge of their obligations to [Plaintiff] and its customers, SUMBING and CANDIA, through IDENITQA SOLUTIONS, made a fraudulent transfer by transferring assets to IDENTIQA GROUP, and subsequently ARCUS INNOVATIONS with the intent of hindering, delaying and defrauding Plaintiffs." (Id. at ¶ 148) According to Plaintiff, IDENTIQA SOLUTIONS "became insolvent after such transfers." (Id. at ¶ 64)

Plaintiff's allegations, which are deemed admitted by virtue of Defendants' default, are sufficient to establish that a constructive fraudulent transfer occurred. See

<u>In re Teltronics, Inc.</u>, 904 F.3d at 1310. Plaintiff is entitled to default judgment on this claim.

### ix. Count IX – Copyright Infringement Claim Against LP and ESPINOSA

In Count IX, Plaintiff brings a copyright infringement claim against both LP and ESPINOSA pursuant to the Copyright Infringement Act, 17 U.S.C. § 101, et seq. A claim for copyright infringement requires (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. <u>Compulife Software, Inc. v. Newman</u>, 959 F.3d 1288, 1301 (11th Cir. 2020); <u>Prokos v. Exceedant, LLC</u>, 2019 WL 5698379, *1 (M.D. Fla. Aug. 27, 2019). Under 17 U.S.C. § 410(c), a certificate of registration "made before or within five years after first publication of the work" constitutes prima facie evidence of the validity of the copyright. <u>Latimer v. Roaring Toyz, Inc.</u>, 601 F.3d 1224, 1233 (11th Cir. 2010). A work is published for purposes of the Copyright Act when copies are distributed "to the public by sale or other transfer of ownership, or by rental, lease, or lending" or offered to be distributed "to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101.

Here, Plaintiff alleges a sufficient factual basis for default judgment against LP and ESPINOSA. Plaintiff alleges ownership of a valid copyright, claiming that "[s]ince 2019, [Plaintiff] has consistently and continuously marketed, advertised, displayed, and sold its publications and has provided its products and services throughout the United States." (Dkt. 63 at ¶ 27) Plaintiff states it "is and always has

been the sole, worldwide copyright owner of certain content in textual form, including

without limitation, its business forms, contracts and website content." (Id. at ¶ 151)

Plaintiff alleges that it has a valid "United States Copyright Registration Number

TXu002257152 bearing an effective date of March 18, 2021." (See id. at ¶ 152; Dkt.

63-3) Thus, Plaintiff has alleged the certificate of registration was "made . . . within

five years after first publication of the work." See 17 U.S.C. § 410(c). Plaintiff further

claims that the copyright grants it the "exclusive rights to copy, reproduce, distribute,

and publicly display the copyrighted materials and create derivative works therefrom."

(Dkt. 63 at ¶ 152) In short, Plaintiff has provided prima facie evidence of the validity

of the copyright. See Latimer, 601 F.3d at 1233.

Plaintiff states that Defendant LP infringed on its copyrighted work. (Id. at ¶

153) According to Plaintiff, "Defendant LP, without the permission or consent of

Plaintiff . . . has copied, reproduced, imitated, distributed, publicly displayed and

created derivative works of and from [Plaintiff's] copyright protected text, material

and other content in its business forms, agreements and website for profit." (Id.)

Plaintiff's allegations are not conclusory. Plaintiff claims that LP has "copied, imitated

and reproduced a website virtually identical to that of [Plaintiff] and published and

displayed it publicly." (Id. at 74) Plaintiff also explains that "LP has gone as far as

providing an identical standard service agreement to that of [Plaintiff] to previous,

current, and prospective customers of [Plaintiff]." (Id. at 75) Thus, Plaintiff alleges LP

has copied its original work, protected by a valid copyright.

Further, under the Copyright Act, an individual who can control the acts of a corporation may be held jointly and severally liable with the corporate entity for copyright infringements, even in the absence of the individual's actual knowledge of the infringements. <u>Southern Bell Telephone and Telegraph Co. v. Associated Telephone Directory Publishers</u>, 756 F.2d 801, 811 (11th Cir. 1985) (affirming liability of individuals who had a financial interest in the infringing activity and the right to supervise the infringing activities and holding that "[l]iability falls on all of them even if they were ignorant of the infringement"). Here, Plaintiff alleges that "Defendant ESPINOSA control[s] and dominates Defendant LP to the extent that LP has acted and currently acts as an alter ego or mere instrumentality of the transactions of the affairs of ESPINOSA." (Dkt. 63 at ¶ 5) Plaintiff states that Defendant Espinosa "has a financial interest in LP and in the infringing conduct and either directly engaged in the infringing conduct or had the ability to supervise same." (Dkt. 63 at ¶ 154) Thus, Plaintiff alleges facts sufficient to support the liability of both Defendants for copyright infringement.

### x. Count XI – Unjust Enrichment Claim Against The IDENTIQA Parties

In Count XI, Plaintiff claims that the IDENTIQA Parties have been unjustly enriched because Plaintiff paid them for services they never performed. (Dkt. 63 at ¶¶ 161-67) For the reasons explained below, the motion for default judgment is due to be **GRANTED IN PART** and **DENIED IN PART** as to this claim.

Under Florida law, a claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained that benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof. Marrache v. Bacardi U.S.A., Inc., 17 F.4th 1084 (11th Cir. 2021). "[W]here there is an express contract between parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment." Pearlman v. Millenium Exec. Realty, Inc., No. 09-81221-civ-Hurley/Hopkins, 2010 U.S. Dist. LEXIS 151726 at *7 (S.D. Fla. May 7, 2010) (quoting Moynet v. Courtois, 8 So.3d 377, 379 (Fla. 3d DCA 2009)); see Ocean Commc'ns, Inc. v. Bubeck, 956 So. 2d 1222, 1225 (Fla. 4th DCA 2007). However, an unjust enrichment claim against defendants who were *not* parties to the express contract can survive because there is no "adequate legal remedy against [these] defendants." Id.

Here, Plaintiff and Defendant IDENTIQA SOLUTIONS entered into an express contract. (See Dkt 63 at ¶¶ 38, 142, 144). Because Plaintiff's claims against IDENTIQA SOLUTIONS "arise[] out of that contractual relationship," Plaintiff's request for unjust enrichment fails as to IDENTIQA SOLUTIONS. See Pearlman, 2010 U.S. Dist. LEXIS 151726 at *7. Further, as explained below, Defendants SUMBING and CANDIA are personally liable for the actions of IDENTIQA SOLUTIONS because they are "alter egos" of IDENTIQA SOLUTIONS. See infra. Thus, Plaintiff's unjust enrichment claim also fails as to SUMBING and CANDIA

because the Court has granted Plaintiff default judgment on its breach of contract claim as it relates to these Defendants. See supra.

However, ARCUS INNOVATIONS and IDENTIQA GROUP were not subject to the express contract between Plaintiff and Defendant IDENTIQA SOLUTIONS. (See Dkt. 63-2) Plaintiff alleges that it "conferred a benefit on [Defendants ARCUS INNOVATIONS and IDENTIQA GROUP] by paying for services which [Plaintiff] outsourced on behalf of its clients." (Dkt. 63 at ¶ 162) Plaintiff alleges they "have knowledge of, and appreciated, accepted and/or retained the benefit conferred by [Plaintiff]." (Id. at ¶ 163) Plaintiff avers that it was forced to issue refunds and chargebacks due to the failure of the [Defendants] to furnish the services they were already paid to do and that Defendants "have been unjustly enriched by the retention of the benefits paid by [Plaintiff]." (Id. at ¶¶ 78-81, 165-166) These allegations suffice to establish Plaintiff is entitled to default judgment on its unjust enrichment claim against Defendants ARCUS INNOVATIONS and IDENTIQA GROUP. See Whitney Nat. Bank v. SDC Cmyts., Inc., 2010 U.S. Dist. LEXIS 146296, 2010 WL 1270264, *6 (M.D. Fla. 2010 Apr. 11, 2010) (holding that plaintiff may sue for unjust enrichment even though an express contract governed the subject when defendants "are not parties to the contract in question"). Thus, the motion for default judgment on this claim is **GRANTED** as to ARCUS INNOVATIONS and IDENTIQA GROUP but **DENIED** as to IDENTIQA SOLUTIONS, SUMBING and CANDIA.

**B. Alter Ego Liability**

Count X of the Second Amended Complaint asserts alter ego liability against Defendants CANDIA and SUMBING. (Dkt. 63 at ¶¶ 157-160). "Piercing the corporate veil" is not an independent cause of action, <u>Peacock v. Thomas</u>, 516 U.S. 349, 354, 116 S. Ct. 862, 133 L. Ed. 2d 817 (1996), but a theory to impose liability on individuals for the debts and actions of a corporation, <u>see Dania Jai-Alai Palace, Inc. v. Sykes</u>, 450 So. 2d 1114 (Fla. 1984). The same is true under state law in that "piercing the corporate veil is not an independent cause of action under Florida law." <u>Gumbel v. Scott</u>, No. 09-60480-CIV-JORDAN, 2010 U.S. Dist. LEXIS 151624, 2010 WL 11505125, at *2 (S.D. Fla. Jan. 6, 2010) (dismissing without prejudice standalone allegation of piercing the corporate veil) (citing <u>Turner Murphy Co. v. Specialty Constructors, Inc.</u>, 659 So 2d 1242, 1245 (Fla. 1st DCA 1995)). Thus, the Court construes Count X as seeking to impose liability on Defendants CANDIA and SUMBING for any judgment entered against the corporate Defendants IDENTIQA SOLUTIONS, IDENTIQA GROUP, and ARCUS INNOVATIONS.

The Eleventh Circuit has stated, "[i]It is black letter law in Florida that to disregard [the] corporate fiction and hold the corporation's owners liable—to 'pierce the corporate veil'—the plaintiff must prove that: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." <u>Molinos Valle Del Cibao, C. por A. v. Lama</u>, 633 F.3d 1330,

1349, (11th Cir. 2011) (emphasis in original) (citing <u>Gasparini v. Pordomingo</u>, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008)).

Here, Plaintiff sufficiently alleges facts satisfying all three elements. It explains that "Defendants SUMBING and CANDIA control and dominate Defendants IDENTIQA SOLUTIONS, IDENTIQA GROUP [,] and ARCUS INNOVATIONS to the extent that these corporations have acted or currently act as mere instrumentalities of the transaction of the affairs of SUBMING and CANDIA." (Dkt. 63 at ¶ 15; <u>see</u> <u>id.</u> at ¶ 158)

As explained above, Plaintiff alleges the corporate form was used for multiple fraudulent or improper purposes. For example, Plaintiff claims the IDENTIQA Parties, in violation of the Agreement, divulged its trade secrets to LP by, including but not limited to, furnishing Plaintiff's current and prospective client list to LP. (<u>See</u> <u>id.</u> at ¶¶ 45-49) Plaintiff also alleges that "at the direction of SUMBING and CANDIA, IDENTIQA SOLUTIONS purposely halted performing [under the Agreement], leaving publishing [and] fulfillment marketing tasks incomplete or not started altogether." (<u>Id.</u> at ¶ 55) Thus, Plaintiff has alleged that the corporate form was used for improper purposes.

As stated earlier, Plaintiff claims that during the time it "voiced its concerns about IDENTIQA SOLUTIONS's performance under the Agreement, SUMBING and CANDIA transferred assets from IDENTIQA SOLUTIONS to IDENTIQA GROUP without IDENTIQA SOLUTIONS receiving a reasonably equivalent value in exchange for such transfers." (<u>Id.</u> at ¶ 63) Plaintiff claims that IDENTIQA

SOLUTIONS became insolvent after such transfers. (Id. at ¶ 64) Plaintiff asserts that the IDENTIQA Parties "were aware of [Plaintiff's] claims of breach at the time the said transfers were made." (Id. at ¶ 65) Thus, Plaintiff's allegations demonstrate that SUMBING and CANDIA acted improperly while intending to benefit from the protection that IDENTIQA SOLUTIONS' corporate form provided them against liability. Only after Plaintiff began to voice its concerns that IDENTIQA SOLUTIONS was in breach of the Agreement that it signed with Plaintiff did SUMBING and CANDIA transfer assets from IDENTIQA SOLUTIONS to a new entity, IDENTIQA GROUP, causing IDENTIQA SOLUTIONS to become insolvent.

Finally, as explained above, such conduct has caused injury to Plaintiff in the form of monetary damages and harm to goodwill and business reputation. (See Dkt. 63 at ¶¶ 86-87) In light of the foregoing, the Court holds Defendants CANDIA and SUMBING liable for the actions of IDENTIQA SOLUTIONS, IDENTIQA GROUP, and ARCUS INNOVATIONS. See Morris v. Bischoff, No. 96-1384-Civ-T-17A, 1997 U.S. Dist. LEXIS 3176, 1997 WL 128114, at *8 (M.D. Fla. Mar. 4, 1997) (finding complaint alleging use of the corporate form to avoid liability sufficient to pierce the corporate veil).

### C. Requests for Relief

The Court turns to addressing Plaintiff's requests for relief as they relate to the surviving counts, which Plaintiff seeks against Defendants, jointly and severally. (Dkt. 32 at 32) Plaintiff seeks actual and exemplary damages under the DTSA (Count I) and

FUTSA (Count II). (Dkt. 63 at ¶¶ 91-105) Plaintiff requests attorneys' fees under the DTSA. (See id.) Plaintiff also requests injunctive relief and disgorgement of all profits derived from the misappropriation of Plaintiff's trade secrets under these counts. (See id.) Under FDUTPA (Count IV), Plaintiff requests an award of actual damages and attorneys' fees. (Id. at ¶¶ 118-124) Plaintiff also requests injunctive relief under this count. (See id.)

Under FUFTA (Count VIII), Plaintiff seeks "judgment for the amount to satisfy its claim, avoidance of the transfer, and attachment of the asset transferred or other property of the transferee" pursuant to Fla. Stat. §§ 726.108, 726.109. (See id. at ¶¶ 146-149) Under the copyright infringement claim (Count IX), Plaintiff claims that LP and ESPINOSA's conduct was willful and thus seeks the maximum statutory damages pursuant to 17 U.S.C. § 504(c) and attorney's fees. (Id. at § 150-156) Plaintiff also requests injunctive relief and disgorgement of Defendants' profits under this count. (See id.) On all other counts, including Plaintiff's civil conspiracy claim (Count V), tortious interference with business relations claim (Count VI), breach of contract claim (Count VII), and unjust enrichment claim (Count XI), Plaintiff requests an award of damages. (See id. at ¶¶ 125-145) The Court will address each claim in turn.

### i. Damages

Once liability is established, federal courts then address the terms of the judgment. "A default judgment must not differ in kind from or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Moreover, if unspecified monetary damages are sought, the party moving for default judgment has the burden

to prove the unliquidated sums in a hearing on damages or otherwise." See Fed. R. Civ. P. 55(b)(1)-(2)). Under Rule 55(b)(2), "[t]he court may conduct hearings . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2)(B). "[The] court has 'an obligation to assure that there is a legitimate basis for any damage award it enters, and to assure that damages are not awarded solely as the result of an unrepresented defendant's failure to respond.'" Anheuser-Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003)). "Well-pled allegations as to damages, however, are also admitted by a default." Giovanno v. Fabec, 804 F.3d 1361, 1366 (11th Cir. 2015) (citing SEC v. Smyth, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005)).

Here, Plaintiff requests that the Court hold an evidentiary hearing for purposes of determining damages and awarding attorneys' fees and costs. (Dkt. 108 at 17; Dkt. 114 at 12) Upon review of the Second Amended Complaint and the Motions for Default Judgment, the Court agrees that an evidentiary hearing is necessary to determine the amount of damages, if any, due to Plaintiff. Plaintiff has not presented the Court with any evidence of damages it claims to have incurred as a result of Defendants' violations of the DTSA (Count I), FUTSA (Count II), FDUTPA (Count IV), civil conspiracy claim (Count V), tortious interference with business relations claim (Count VI), breach of contract claim (Count VII), FUFTA (Count VIII), and unjust enrichment claim (Count XI). Further, to the extent any of the foregoing counts

entitle Plaintiff to attorneys' fees,[2] Plaintiff has not presented the Court with any evidence of amounts billed for such fees in this action. Lastly, Plaintiff fails to attach a certified Bill of Costs, allowing the Court to calculate accurately what costs Plaintiff is entitled to under applicable law. As such, the Court reserves decision on the amount of damages, attorneys' fees and costs Plaintiff may be entitled to until the conclusion of an evidentiary hearing.

### ii. Copyright Infringement Claim Against LP and ESPINOSA (Count IX)

The Copyright Act permits a plaintiff to elect either actual or statutory damages. 17 U.S.C. § 504. Under § 504(c)(1), a copyright owner may elect to recover, instead of actual damages, statutory damages for work infringed "in a sum of not less than $750 or more than $30,000 as the court considers just." In the Motions for Default Judgment, Plaintiff states that it elects statutory damages. (Dkt. 108 at 14; Dkt. 114 at 9) When the copyright owner sustains the burden of proving that an infringement was committed willfully, the court may increase the award of statutory damages up to $150,000 for each infringement. See 17 U.S.C. § 504(c)(2). Plaintiff asserts that Defendants acted willfully and requests an award of $150,000. Even if Defendants acted willfully, the Court finds that it cannot award Plaintiff statutory damages.

---

[2] The Court notes that litigants "are ordinarily required to bear their own attorney's fees" absent express statutory authority or an enforceable contract. Buckhannon Bd. & Care Home v. W. Virginia Dep't of Health & Human Res., 532 U.S. 598, 602, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001); see also Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 257, 95 S. Ct. 1612, 44 L. Ed. 2d 141. The same is true for claims brought under Florida law. See Price v. Tyler, 890 So. 2d 246, 250 (Fla. 2004) ("Under Florida law, each party is responsible for its own attorneys' fees unless a contract or statute provides otherwise.").

A plaintiff is not entitled to statutory damages for "(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412. "The term 'commenced' is defined as the first act of infringement in [a] series of ongoing separate infringements." Cornerstone Home Builders, Inc. v. McAllister, 311 F. Supp. 2d 1351, 1352 (M.D. Fla. 2004); see Derek Andrew, Inc. v. Poof Apparel Corp., 528 F.3d 696, 700-01 (9th Cir. 2008) ("Every court to consider the issue has held that infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs.").

As stated earlier, Plaintiff alleges that, "since 2019, [it] has consistently and continuously marketed, advertised, displayed, and sold its publications and has provided its products and services throughout the United States." (Dkt. 63 at ¶ 27) Based on Plaintiff's allegations, Defendants LP and ESPINOSA began copying and imitating its website and standard service agreement no earlier than July 2020, which is when Defendant LP filed its articles of incorporation with the Virginia Secretary of State. (See Dkt. 63 at ¶¶ 42, 51-53, 74-75) However, Plaintiff alleges that it did not register its copyrightable content with the United States Copyright Office until March 18, 2021, which is at least eight months *after* Plaintiff alleges LP began infringing on its material. (See Dkt. 63-3) Thus, Plaintiff is not entitled to elect statutory damages for the alleged copyright infringements because the infringements commenced at least

eight months before the effective date of the registration. See Fey v. Panacea Mgmt. Grp. LLC, 261 F. Supp. 3d 1297, 1310 (N.D. Ga. May 18, 2017) (granting summary judgment to defendants because plaintiff failed to demonstrate entitlement to statutory damages where "the infringements commenced approximately one year before the effective date of the Drawing's registration."); see also Cornerstone Home Builders, Inc. v. McAllister, 311 F. Supp. 2d 1351, 1352 (M.D. Fla. 2004) ("The Eleventh Circuit holds that a plaintiff is not entitled to attorney's fees or statutory damages . . . when the work at issue is not registered with the copyright office at the time the alleged infringement occurred.").[3]

### iii. Disgorgement

The remedy of disgorgement is aimed at preventing a defendant from being unjustly enriched. See Hard Candy, LLC. v. Anastasia Beverly Hills, Inc., 921 F.3d 1343, 1353 (11th Cir. 2019) (quoting SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 580 U.S. 328, 137 S. Ct. 954, 964, 197 L. Ed. 2d 292 (2017)); TB Food USA, LLC v. Am. Mariculture, Inc., 2022 U.S. Dist. LEXIS 136423, 2022 WL 3028061, at *18 (M.D. Fla. Aug. 1, 2022) (citing S.E.C. v. Monterosso, 756 F.3d 1326, 1337 (11th Cir. 2014)). Unlike actual damages, which are calculated based on a

---

[3] The Court notes that while Plaintiff's Motions for Default Judgment state that Plaintiff elects statutory damages, Plaintiff's Second Amended Complaint also requests an award of "actual damages." Actual damages are "often measured by the revenue that the plaintiff lost as a result of the infringement." Thornton v. J Jargon Co., 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008) (citing Montgomery v. Noga, 168 F.3d 1282, 1295 n.19 (11th Cir. 1999)). Actual damages include lost sales, lost opportunities to license, and diminution in the value of the copyright. Id. To the extent Plaintiff seeks an award of actual damages, it may establish its entitlement to such damages at the evidentiary hearing.

victim's losses or other injuries, disgorgement "is measured by a defendant's ill-gotten profits or gains." <u>TB Food USA, LLC</u>, 2022 U.S. Dist. LEXIS 136423, 2022 WL 3028061, at *18 (citing <u>Monterosso</u>, 756 F.3d at 1337).

Here, Plaintiff requests that Defendants "disgorge all profits derived from the misappropriation of [Plaintiff's] customer information and other trade secrets and/or any of their employees or affiliates acting on their behalf." (Dkt. 63 at 32) Plaintiff also requests that Defendants disgorge any profits stemming from their copyright violations. (<u>Id.</u> at 33)

Under the DTSA (Count I) and the FUTSA (Count II), Plaintiff may be entitled to the disgorgement of Defendants' profits. <u>See</u> <u>Advantor Systems Corporation v. DRS Technical Services, Inc.</u>, 678 Fed. App'x 839, (11th Cir. 2017) ("Damages for a FUTSA violation "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation. Fla. Stat. § 688.004(1)."); [4] 18 U.S.C. § 1836(b)(3)(B)(i)(II) (providing that a plaintiff may be entitled to an award of damages under the DTSA "for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss").

With respect to Defendants' copyright violation (Count IV), 17 U.S.C. § 504(b) similarly provides that "[t]he copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." "In establishing the infringer's profits, the copyright

---

[4] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority.  <u>See</u> 11th Cir. R. 36-2."  <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000).

owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

The "primary limiting principle" in deciding whether disgorgement of a defendant's profits is appropriate is that the damages not be "'speculative.'" TB Food USA, LLC, 2022 U.S. Dist. LEXIS 136423, 2022 WL 3028061, at *18 (quoting Hard Candy, 921 F.3d at 1353). In the end, a district court is afforded wide latitude in deciding whether to order disgorgement. Id. (citing SEC v. K.W. Brown & Co., 555 F. Supp. 2d 1275, 1312 (S.D. Fla. 2007)).

In support of its request for disgorgement, Plaintiff points to LP's responses to Plaintiff's First Set of Interrogatories, which ESPINOSA provided to Plaintiff on behalf of LP before LP and ESPINOSA defaulted in this matter. (Dkt. 114-1) Therein, LP admits that it collected $999 from each author in relation to 100 books that were finished, created, published, distributed, and/or marketed by LP from July 1, 2020, to on or around November 10, 2021. (See Dkt. 114-1 at 4, 5) Plaintiff, therefore, asserts that "Defendant LP [has] admitted to receiving at least $99,000 from customers as a result of their conspiracy against Plaintiff." (Dkt. 114 at 11)

Based on the foregoing, the Court finds that Plaintiff is entitled to disgorgement of LP's and ESPINOSA's profits in the amount of $99,900, which represents the amount of money LP admits it collected from each author as a result of the misappropriation of Plaintiff's trade secrets and copyright infringement. Plaintiff has shown through its well-pleaded allegations that LP and ESPINOSA intentionally

misappropriated Plaintiff's customer information for their own benefit, used Plaintiff's copyrighted material without authorization, and were unjustly enriched as a result of this unlawful scheme when they were paid for such services. It is also apparent that allowing LP and ESPINOSA to retain their profits could incentivize LP, ESPINOSA, and other wrongdoers to engage in similar illicit activity moving forward. And it is further evident that LP's and ESPINOSA's decision to effectively abandon any defense of this lawsuit has rendered it difficult, if not impossible, for Plaintiff to prove the entirety of its actual damages with any degree of reasonable certainty.

Therefore, the Court finds that disgorgement is an appropriate remedy and that Plaintiff has tendered adequate proof for the disgorged profits it seeks. See Hard Candy, 921 F.3d at 1353–54 (concluding that a plaintiff must only prove a defendant's sales). Plaintiff should receive the sum of the amount of money LP and ESPINOSA collected from Plaintiff's clients. (See Dkt. 114-1 at 4, 5)

Plaintiff has also requested disgorgement of profits from IDENITQA SOLUTIONS, IDENTIQA GROUP, ARCUS INNOVATIONS, INC., LORAINE SUMBING, and LEOVIE JOY CANDIA. However, Plaintiff has only presented evidence of the profits LP and ESPINOSA obtained as a result of their misappropriation of Plaintiff's trade secrets and copyright violations. (See Dkt. 114-1) While the Court believes Plaintiff may be entitled to disgorgement against the IDENTIQA Parties, jointly and severally with LP and ESPINOSA, for violating the

DTSA (Count I) and the FUTSA (Count II), the Court shall reserve decision on the final amount owed until the conclusion of an evidentiary hearing.

### iv. Injunctive Relief

Plaintiff requests permanent injunctive relief to enjoin Defendants from future engagement in the acts described above. Plaintiff's claims under the DTSA (Count I), FUTSA (Count II), FDUTPA (Count IV), and copyright infringement (Count XI) provide for injunctive relief.

Under the Defend Trade Secrets Act, a court may grant an injunction to prevent the "actual or threatened misappropriation" of trade secrets. 18 U.S.C. § 1836(b)(3)(A)(i). Florida law similarly provides for injunctive relief to prevent the misappropriation of trade secrets. Fla. Stat. § 688.002. Pursuant to Fla. Stat. § 501.211(1), FDUTPA allows "a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc., 123 So. 3d 1149, 1152 (Fla. Dist. Ct. App. 2012). And the Copyright Act, at 17 U.S.C. § 502(a), expressly provides for the entry of injunctive relief: "Any court having jurisdiction of a civil action arising under this title may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."

A plaintiff is entitled to permanent injunctive relief where it demonstrates: (1) it has succeeded on the merits; (2) it has suffered irreparable injury; (3) there is no adequate remedy at law; (4) the balance of hardship favors an equitable remedy; and

(5) the issuance of an injunction is in the public's interest. eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006). Injunctive relief is an available remedy even in default judgment cases and can be awarded to a plaintiff without a hearing. PetMed Express, Inc. v. MedPets.com, Inc., 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004).

Plaintiff easily satisfies the first element. "[W]hen a defendant is in default, the element of success on the merits is satisfied." Virgin Records Am., Inc. v. Courson, 2007 U.S. Dist. LEXIS 75969, 2007 WL 3012372, at *2 (M.D. Fla. Oct. 12, 2007) (citing Sony Music Entm't v. Global Arts Prods., 45 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999)).

Plaintiff has also established irreparable harm. Plaintiff alleges that "Defendants' actions have caused grave harm to [Plaintiff's] goodwill and business reputation in its industry, and with their existing customers in addition to economic harm." (Dkt. 63 at ¶ 86) Plaintiff claims that "Defendants' actions have and continue to severely and negatively impact [Plaintiff's] ability to acquire new customers and retain existing customers for continuing projects." (Id. at ¶ 87) These allegations, particularly when coupled with Defendants' decision to fail to appear in this litigation and thus deny Plaintiff full discovery on the issue of damages, adequately demonstrate the requisite irreparable harm under the circumstances presented here. Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975)[5] (concluding that

---

[5] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

economic loss was irreparable where monetary damages were not "susceptible of specific proof"); Chanel, Inc. v. Replicachanelbag, 362 F. Supp. 3d 1256, 1263 (S.D. Fla. 2019) (noting that the "[d]efendants' failure to respond or otherwise appear in th[e] action [made] it difficult for [the p]laintiff to prevent further [Lanham Act violations] absent an injunction") (citing Jackson v. Sturkie, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003) ("[The d]efendant's lack of participation in this litigation has given the court no assurance that [the] defendant's [unlawful] activity will cease. Therefore, [the] plaintiff is entitled to permanent injunctive relief.")).

Plaintiff's well-pleaded allegations also demonstrate there is no adequate remedy at law. Plaintiff asserts that "[u]nless enjoined from doing so, the Defendants will continue to violate Plaintiff's rights and further destroy [Plaintiff's] goodwill and reputation in its industry." (Dkt. 63 at ¶ 87) These allegations, coupled with other averments referenced above, demonstrate that monetary damages will not address the ongoing nature of the harm the Plaintiffs continue to suffer.

As for the fourth element, the balance of hardships likewise weighs in favor of a permanent injunction against Defendants. Plaintiff has established by way of its complaint that it has and will continue to suffer harm as a result of Defendants' FDUTPA and copyright violations. By contrast, the only harm Defendants will experience because of a permanent injunction is the loss of their ability to engage in the prohibited behavior identified in the complaint. (See Dkt. 63) And regarding the last element, the issuance of a permanent injunction will serve the public's interests because it will protect consumers from Defendants' deceptive practices.

In light of the foregoing, the Court finds that permanent injunctive relief is warranted as set forth in the Second Amended Complaint. <u>See</u> Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

## IV.    CONCLUSION

Accordingly, it is hereby **ORDERED** as follows:

1. Plaintiff's Motion for Default Judgment (Dkt. 108) is **GRANTED IN PART and DENIED IN PART**. The Motion (Dkts. 108) is **DENIED** as to Count III (Lanham Act). The Motion (Dkt. 108) is **DENIED IN PART** as to Count XI (Unjust Enrichment) as to IDENTIQA SOLUTIONS, SUMBING and CANDIA. The Motion is otherwise **GRANTED** as to the remaining Counts.

2. Plaintiff's Motion for Default Judgment (Dkt. 114) is **GRANTED IN PART**. The Motion (Dkt. 114) is **DENIED** only as to Plaintiff's request for statutory damages under Count IX (Copyright Infringement).

3. The Court shall reserve decision on Plaintiff's request for damages and attorneys' fees until the conclusion of an evidentiary hearing. Plaintiff is directed to file a Bill of Costs with the Clerk of Court no later than **fourteen (14) days** from the date of this Order.

4. The Motions are **DENIED** as to Plaintiff's request for statutory damages under Count IX (Copyright Infringement).

5. Plaintiff's request for disgorgement of Defendants' profits is **GRANTED IN PART**. Plaintiff shall be awarded **$99,900** in statutory disgorgement damages from LP and ESPINOSA, jointly and severally. To the extent Plaintiff is entitled to the same or more disgorgement damages from the IDENTIQA Parties, jointly and severally with LP and ESPINOSA, Plaintiff shall present proof of its entitlement to such damages at the evidentiary hearing.

6. Plaintiff's request for a permanent injunction against all Defendants from conducting infringing conduct hereby is **GRANTED**. Defendants, their officers, managers, employees, agents and anyone acting on their behalf or in concert with them are hereby **ENJOINED** from the following:

   a. Using, disclosing, mentioning or continuing to possess Plaintiff's confidential information and trade secrets, including any and all Plaintiff's current and potential customer information, fulfillment status obtained by IDENTIQA SOLUTIONS during its contractual relationship with Plaintiff;

   b. Soliciting or contacting any Plaintiff's existing customers and any potential customer referenced in any document furnished or prepared by or on behalf of Plaintiff;

   c. Interfering with any contracts, agreements, business relationships, or potential business relationships contracts or agreements of Plaintiff;

   d. Engaging in deceptive or unfair trade practices; and from

e. Copying, reproducing, imitating, publicly displaying, or creating derivative works from Plaintiff's copyrighted works or otherwise infringing on Plaintiff's copyrights whether now in existence or later created.

**DONE** and **ORDERED** in Tampa, Florida, this 12th day of February 2025.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any pro se party

46